# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| GARY JOE HARRISON, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:15-CV-37-PRC |
| ) | |
| TOWN OF GRIFFITH, GRIFFITH POLICE ) | |
| DEPARTMENT, JASON JAQUES, TONY ) | |
| MORRIS, GREG MANCE, and ) | |
| DAVID BORGETTI, ) | |
|     Defendants. ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 79], filed by Defendants Town of Griffith, Griffith Police Department, Jason Jaques, Tony Morris, Greg Mance, and David Borgetti on April 28, 2017, and on a Motion to Strike Non-Sworn Statements Contained in Plaintiff's Response to Defendants' Motion for Summary Judgment [DE 85], filed by Defendants on June 6, 2017. All motions were fully briefed on June 20, 2017.

In his First Amended Complaint, filed on July 2, 2015, Plaintiff Gary Joe Harrison brings claims under 42 U.S.C. § 1983 for alleged violations of the United States Constitution. In Count I, Harrison alleges claims of excessive force by Defendants Officers Jason Jaques, David Borgetti, and Tony Morris in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Harrison asserts that he suffered the following injuries from the officers' alleged excessive use of force: a broken left arm and wrist, stomach injuries, and injuries to his mouth. *See* (ECF 80-7) (Resp. to Inter. No. 12).[1] In Count II, Harrison alleges a claim of failure to train and

---

[1] The exhibit containing Harrison's Response to Interrogatory No. 12 was an email from Harrison's counsel to counsel for Defendants; thus, it was not signed by Harrison. *See* Fed. R. Civ. P. 33(b)(5) ("The person who makes the answers must sign them . . . ."). Harrison did not provide evidence of having produced a signed copy of this interrogatory response.

supervise with regard to the alleged excessive force against Defendants Chief of Police Greg Mance, the Town of Griffith, and the Griffith Police Department. Counts III and IV are claims of deprivation of necessary medical care against Defendants Officers Jaques, Borgetti, and Morris and against Defendant Chief Mance, respectively. Count V alleges a claim of failure to train and supervise with regard to the deprivation of necessary medical care against Defendants Chief Mance, the Town of Griffith, and the Griffith Police Department.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure require that a motion for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable [juror] could find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes

demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56 (a), (c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015). When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Spierer*, 798 F.3d at 507-08; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013).

"Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(c)(1), (e); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1986)). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248-50.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor

of that party. *See Anderson*, 477 U.S. at 255; *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764, 765 (7th Cir. 2014); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MOTION TO STRIKE

In the Motion to Strike, Defendants ask the Court to strike from the record two factual assertions in Plaintiff's Response Brief in Opposition of Defendants' Motion for Summary Judgment that contain inadmissible evidence. Defendants also ask the Court to strike the legal arguments made based on the unsupported factual assertions. Harrison did not respond to the Motion to Strike.

First, Harrison's "Statement of Genuine Disputes" includes the statement: "As Officer Jaques was escorting Mr. Harrison out of the cell, he intentionally torqued Mr. Harrison's wrist causing Mr. Harrison severe pain." (ECF 82, p. 2 (citing ECF 80-4) (Def. Ex. 4–Cam Cell 1 at 9:45:30)). The only evidence cited in support of this factual assertion is the police video. However, the video does not show that Officer Jaques "intentionally torqued Mr. Harrison's wrist." *See* (ECF 80-4). At the time of 9:45:30 on Cam Cell 1, Harrison's wrists are not visible. What is visible at that time on Cam Cell 1 is that Harrison hit his upper arms on the cell door frame, stopping his forward motion. *Id*. Harrison has not testified under oath or offered any sworn statement that Officer Jaques injured Harrison's wrist when his hands were behind his back as they were walking out of the cell.

Also, Harrison's prior testimony contradicts this new, unsupported assertion made in his response brief. Harrison previously testified that Officer Jaques attacked him in the cell and popped his wrist while his wrist was in front of him when Harrison was on or near the bed; Harrison gestured during his videotaped deposition to show how the events allegedly occurred. *See* (ECF 83-

4

1, pp. 19:3-22; 46:16-53:18; 130:4-132:21; 147:10; 150; 3; 157:25-158:13); *see also* (ECF 85-1) (Ex. 1 to Mot. to Strike–Video Dep. Gary Joe Harrison); (ECF 84, 86, 87, 88) (manual filing of video).

As the new version of the events in the response brief is not supported by the videotape recording and is contrary to Harrison's prior deposition testimony, the Court grants the Motion to Strike as to this statement and STRIKES from Harrison's Statement of Genuine Issues the sentence: "As Officer Jaques was escorting Mr. Harrison out of the cell, he intentionally torqued Mr. Harrison's wrist causing Mr. Harrison severe pain." (ECF 82, p. 2 (citing Def. Ex–4 Cam Cell 1 9:45:30)).

Second, Harrison's Statement of Genuine Issues provides that Officer "Jaques placed him in handcuffs." (ECF 82, p. 2 (citing generally Def. Ex. 4)). Harrison also indicates several times in the Law and Argument section that Harrison was in handcuffs and that "it was clearly established law that it was unlawful to use excessively tight handcuffs and apply significant force to suspects that were not resisting arrest, did not disobey orders, and did not pose a threat." (ECF 82, p. 4). Harrison then reasons that "[a] reasonable jury can find that Jaques knew that applying unreasonable force to Harrison's wrists that were bound in handcuffs when he was not resisting violated Harrison's constitutional rights." *Id*.

Harrison cites no evidence that Officer Jaques placed Harrison in handcuffs. Rather, Harrison testified that Officer Jaques did *not* have handcuffs and did *not* place Harrison in handcuffs. (ECF 83-1, p. 50:3-51:15). The video also shows that Harrison was not placed in handcuffs. (ECF 80-4). The Court grants the Motion to Strike as to this statement and STRIKES the asserted fact: "Jaques placed him in handcuffs." (ECF 82, p.2). As a result, the Court disregards Harrison's legal citations and arguments referencing unreasonable or excessive force in relation to the use of handcuffs.

5

**MATERIAL FACTS**

On April 18, 2014, Griffith Police Department Officers Jason Jaques and David Borgetti responded to a residence in Griffith, Indiana, as a result of a domestic violence disturbance call. (ECF 80-1, ¶ 3; 80-2, ¶ 3). Upon arrival, Officers Jaques and Borgetti spoke with the complainant Cathy McFerren, who represented that she was Plaintiff Gary Jo Harrison's ex-wife. (ECF 80-1, ¶ 4; 80-2, ¶ 4). The Officers observed blood coming from McFerren's nose and a bump on the top of her head. (ECF 80-1, ¶ 5; 80-2, ¶ 5). Harrison was detained on suspicion of domestic battery and was transported to the Griffith Police Department. (ECF 80-3). Harrison showed no signs of being in need of medical care, nor did he request medical treatment. (ECF 80-1, ¶ 10; 80-2, ¶ 10).

Once at the Griffith Police Department, Officers Jaques and Borgetti directed Harrison to the Cell Hall where they searched him and had Harrison remove his personal belongings. (ECF 80-4) (Griffith Police Department Surveillance Video); (ECF 80-1, ¶ 11; 80-2, ¶ 11). The officers then placed Harrison in Cell 1 and left the area. (ECF 80-4); (ECF 80-1, ¶¶ 12-13; 80-2, ¶¶12-13). Harrison removed his shirt and started to secure it to the cell door bars in an attempt to hang himself. (ECF 80-4); (ECF 80-1, ¶ 13; 80-2, ¶ 13). As soon as Harrison climbed onto the first rung of the cell door bars, Officer Jaques, Officer Borgetti, and Defendant Officer Tony Morris entered the cell hall and released Harrison's shirt from the cell door bars. (ECF 80-4); (ECF 80-1, ¶ 14; 80-2, ¶ 14). Harrison was not successful in his attempt to hang himself nor did he lose consciousness as a result of his attempt. (ECF 80-4); (ECF 80-1, ¶ 15; 80-2, ¶ 15).

As the cell door was opening, Harrison jumped down and lay down on the cot inside the cell. (ECF 80-4); (ECF 80-1, ¶ 16; 80-2, ¶ 16). Officer Morris removed the shirt from around Harrison's neck, attempted to calm Harrison down, and left the cell. (ECF 80-4); (ECF 80-1, ¶ 17; 80-2, ¶ 17). Officers Jaques and Borgetti remained in the cell with Harrison to ensure his safety. (ECF 80-1, ¶

18; 80-2, ¶ 18). Shortly thereafter, Officer Borgetti left the cell. (ECF 80-1, ¶ 19; 80-2, ¶ 19). Officer Jaques stayed in the cell with Harrison until Prompt Ambulance's arrival at the Griffith Police Department. (ECF 80-1, ¶ 20). After notification regarding the paramedics' impending arrival, Officer Jaques advised Harrison to stand up. (ECF 80-1, ¶ 21). Harrison placed his hands in the air. (ECF 80-1, ¶ 22). Jaques slowly and without force placed Harrison's hands behind his back. (ECF 80-1, ¶ 23). Harrison was escorted out of the cell to the door leading to the police parking lot without incident. (ECF 80-1, ¶ 24).

Once outside, Officer Jaques escorted Harrison to the waiting gurney with Officer Borgetti nearby. (ECF 80-1, ¶ 25). As Harrison started to sit on the gurney, he began to resist Officer Jaques by planting his feet, screaming, and attempting to leave the gurney. (ECF 80-1, ¶ 26; 80-2, ¶ 25). The ambulance rocked violently back and forth as a result of Harrison's movements, and the paramedics motioned to the officers to help with Harrison. (ECF 80-1, ¶ 21). Officer Jaques, Officer Borgetti, and Officer Morris responded. (ECF 80-1, ¶ 32). The paramedics transported Harrison to Community Hospital in Munster, Indiana, for evaluation following his attempted suicide. (ECF 80-1, ¶ 34); (ECF 80-3, ¶ 21). Harrison was later transferred to St. Catherine's Hospital in East Chicago, Indiana, on an emergency detention from April 18, 2014, to April 22, 2014. (ECF 80-1, ¶ 35); (ECF 80-3, ¶ 21).

On April 22, 2014, the Griffith Police Department received a call from St. Catherine's Hospital that Harrison was going to be released and that the Griffith Police Department could pick him up since there was a police hold on him. (ECF 80-5, ¶ 5). Harrison was transported from St. Catherine's Hospital to the Griffith Police Department. *Id*. at ¶ 6. Officer Borgetti was not the transporting officer on April 22, 2014. *Id*. On April 23, 2014, Harrison was transported to the Lake County Jail. *Id*. ¶ 8; (ECF 80-6).

7

**ANALYSIS**

Defendants seek summary judgment in their favor on all of Harrison's claims. In his response brief, Harrison abandons all claims except for the claim of excessive force against Defendant Officer Jaques for an alleged wrist injury; however, Harrison has offered no admissible evidence in support of this claim. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are abandoned (citing *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999))). The Court addresses each claim in turn.

**A. Count I – § 1983 Excessive Force**

Defendants seek summary judgment on Harrison's claims of excessive force in violation of the Fourth Amendment to the United States Constitution against Officers Jaques, Borgetti, and Morris. Allegations that a police officer used excessive force are analyzed under the Fourth Amendment's standard of "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). This standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 388, 396; *see also Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472-73 (7th Cir. 2015).

*1.     Officer Jaques*

In their Motion for Summary Judgment, Defendants argue that the undisputed videotape recording of Harrison's cell contradicts Harrison's version of the events and demonstrates that Officer Jaques did not violate Harrison's Fourth Amendment rights. First, Defendants note that Harrison alleges in his First Amended Complaint that Officer Jaques grabbed Harrison's arm with

8

excessive force while subduing Harrison in the cell after his suicide attempt. Defendants then cite Harrison's Response to Interrogatory No. 12, which asserts that Officer Jaques broke Harrison's wrist while Harrison was on or near his cot, facing Officer Jaques, with his left arm up in a defensive position:

> While I was in a holding cell at the Griffith Police Department, I attempted to hang myself with my own clothes. Officers found me and the Lieutenant got him down and laid me down on the cot. Lieutenant left to call the ambulance. Officer [Jaques] was left to keep an eye on me. Officer [Jaques] approached me and ordered that I stand up. I was unable to stand up due to the effects of attempting to commit suicide. Officer [Jaques] approached me and said "you people." As Officer [Jaques] approached me and I saw that he was becoming very aggressive so I put my left arm up in defense. Officer [Jaques] broke my left arm and wrist. I was able to stand up and he would not let go of my arm despite my frantic plea. I attempted to walk out of the cell and down to the other officers with Officer [Jaques] on my back.

(ECF 80-7).

Harrison's deposition testimony similarly specifies that his wrist was injured while he was in the cell near the bed:

> A: . . . I tried to point to try to get some help and he grabbed the wrist, man.
> Q: In the cell?
> A: In the cell. He popped it, man.
> . . .
> A: I heard the pop, so something said get out the cell or you're going to die.

(ECF 80-8, pp. 49:24-25; 50:1-2; 50:17-18).

When questioned by his own attorney, Harrison again confirmed:

> Q: Okay. And I hate to do this to you, but we're going to go back to when you're in the jail cell for the first time. Okay?
> A: Yeah.
> Q: And Jack came up to you, you pointed to the camera, you put your left arm up. Okay?
> A: Uh-huh.
> Q: And then Jack grabbed a hold of your arm?
> A: As soon as he did it, it twists, he popped it.
> Q: And he popped it?
> A: Yeah.

9

*Id.* at pp. 157:25; 158:1-10.

Defendants then cite the videotape recording of the events in the holding cell. The video shows that no force was used against Harrison in the cell, much less any force that would signify a constitutional violation. The video shows that, after Harrison's attempt to hang himself with his shirt, he lay down on the cot inside the cell. (ECF 80-4). After some time, Harrison proceeded to get up from the cot, placing his hands in the air. *Id.* At that point, Officer Jaques placed Harrison's hands behind his back, slowly and without any force. *Id.* Contrary to both Harrison's interrogatory response and deposition testimony, there is nothing on the video that depicts a violent grab of Harrison's wrist. Nor is there any indication of pain on Harrison's face or any body language that would accompany the breaking of a person's wrist. Defendants argue in their motion that nothing in the video supports Harrison's assertion that his left wrist was broken as a result of any force on Officer Jaques' part.

In his response brief, Harrison does not acknowledge the videotape recording, offer argument regarding the videotape recording, or attempt to explain the discrepancy between his version of the events and what is depicted in the videotape recording. Thus, Harrison does not dispute that the videotape recording contradicts his version of the events given in his interrogatory response and his deposition testimony.

Similarly, Defendants argue in their Motion for Summary Judgment that the videotape recording does not show that Harrison escaped out of the cell with Officer Jaques "on his back," which contradicts Harrison's deposition testimony:

> A: All I know by that time he was there talking about some cuff up and pop and I turned sideways, grabbed him and here we go because I ain't standing in that cell. I just tried to hang myself. I'm not going to stand there with him,

no. I tried to run, but he knew how to do something with your feet. He knew how to—he already got the arm.

So he knew how to do some things with your feet and they still—I get medicine for both of them. He knew how to do something with your feet. He knew how to almost flip me, but he couldn't because I already had him sideways and I was going through the cell and then the people was yelling at me get off of him like they know his stuff. . . .

So then I– he was just still standing there, he wasn't saying nothing, but he still got my arm. So I just turned sideways again and I seen the ambulance and all of them and I'm about two, three cells to get to the door. So I picked him up again, come on, I'm not going to stand here and get no help. So I got all the way out there and stepped outside . . . .

(ECF 80-8, pp. 131:14-25; 132:1-3, 9-15). Again, in his response brief, Harrison does not dispute the events in the video or offer any explanation for why his version of the events do not appear in the video.

Defendants argue that Harrison's conflicting version of the facts should not be credited in light of the contradictory and undisputed video evidence. Thus, Defendants argue that there is no genuine issue of material fact for trial and Harrison cannot carry his burden as to his claim of excessive force against Officer Jaques. The Court agrees. *See Scott v. Harris*, 550 U.S. 372, 378, 380 (2007). In *Scott*, the United States Supreme Court held that, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 380. As in *Scott*, there is no allegation by Harrison that "this videotape was doctored or altered in any way" nor is there "any contention that what it depicts differs from what actually happened." *Scott*, 550 U.S. at 378. And, the videotape "quite clearly contradicts the version of the story told by [Harrison]." *Id*. Harrison's "version of the events is so discredited by the record that no reasonable jury [could believe] him." *Id*. at 381. The videotape

11

recording does not support a claim that Officer Jaques violated Harrison's Fourth Amendment rights. *See id.*; *see, e.g.*, *Boyd v. Pollard*, 621 F. App'x 352 (7th Cir. 2015).

Nevertheless, in his response brief, Harrison attempts to create a genuine issue of material fact by asserting for the first time that Officer Jaques injured his wrist as they were walking out of the cell with Harrison's arms being held behind his back. But, Harrison offers no sworn affidavit or declaration in support of this new version of the facts. Even if Harrison had provided such an affidavit, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (recognizing the agreement among the circuits on this issue); *see also Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015); *Abraham v. Washington Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) (citing *Cleveland*, 526 U.S. at 806; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006)). In this case, there is no such affidavit and accompanying explanation; Harrison offers only the unsupported assertion in his brief.

Although the Court granted Defendants' Motion to Strike above, the Court briefly addresses the videotape recording evidence offered by Harrison in support of the assertion that Officer Jaques injured Harrison's wrist while leading him out of the cell. The video shows Officer Jaques taking Harrison's thumbs/hands behind his back without the use of handcuffs. (ECF 80-4 (9:45:17)). Officer Jaques then walked Harrison out of the cell from behind. Harrison's upper arms got lodged in the cell door, which is immediately followed by the facial reaction noted by Harrison in the response brief. *See* (ECF 82, p. 2). Officer Jaques placed Harrison's thumbs in one of his hands and used his right arm to assist Harrison, turning Harrison slightly to get out of the cell without touching

the door frame. Again, there is no sworn testimony from Harrison that, at the very moment Harrison's upper arms hit the door frame, Jaques injured Harrison's wrist in a show of force.

Harrison has always maintained that Officer Jaques injured his wrist while Harrison was in the holding cell near his bed and facing Officer Jaques, which is discredited by the video evidence. And, at no time has Harrison testified that he was injured by Officer Jaques while exiting the holding cell with his hands behind his back; the unsupported assertion in the response brief does not create a genuine issue of material fact. The Court grants summary judgment in favor of Defendant Jason Jaques on Harrison's § 1983 claim of excessive force in Count I.

*2. Officer Borgetti and Officer Morris*

Defendants also move for summary judgment on the excessive force claims brought against Officer Borgetti and Officer Morris. Defendants note that in his deposition, Harrison testified that Officer Borgetti and Officer Morris assaulted him once he left the cell:

> A: . . . . So I got all the way out there and stepped outside. They got cameras everywhere at the hospital–I mean, at the jail all over. I can get some help here. Get out there and by that time they got me. There was three of them. Picked me up, slammed me down and then I told you what happened with [Jaques].

(ECF 80-8, p. 132:14-21). Similarly, Harrison's response to Interrogatory No. 12 provides, appearing to refer to Officer Morris as the "lieutenant":

> The ambulance then arrived and I was placed on the cart. Officers attempted to cuff me to the gurney using my broken arm. I was in severe pain. The lieutenant jumped on top of me and knocked all the wind out of me and blood came out of my mouth. I passed out and woke up in the hospital.

(ECF 80-7). Harrison elaborates in his deposition testimony that this alleged use of excessive force occurred outside the ambulance, after being secured on the gurney:

13

> A: . . . . I mean, the lieutenant, the Devil Devil[2] come around here and jumped up in the air. You know all them keys he had on? I'll show you. Want to see the marks? I still got those and that's been a year and a half ago. I still got those bruises. You see them a year and a half? You see the bruise? You know what that's from? That means somebody came down with some keys because you never had those.
> Q: Okay. Let me ask you —
> A: He came down. Yes, ma'am.
> Q: Let me ask: Where did that happen, the bruises on your stomach?
> A: I'm going to show you. You just stopped the conversation.
> Q: No. I'm —
> A: I'm telling you about the lieutenant.
> Q: Where at?
> A: I haven't even got in the ambulance yet.

(ECF 80-8, pp. 22:14-25; 23:1-7).

Defendants then cite the videotape recording of the incident that shows Officer Jaques leading Harrison to the gurney. As Officer Jaques attempted to help place Harrison onto the gurney, Harrison began resisting the efforts of Officer Jaques and the paramedics. The video shows Harrison turning his head toward Officer Jaques and planting his feet on the ground in an act of resistance. In an attempt to counter Harrison's efforts to resist being secured to the gurney, Officer Jaques leaned Harrison forward, applied pressure to gain control of Harrison, and placed Harrison's upper body on the gurney. Officer Morris then assisted with lifting Harrison's legs onto the gurney. For a short while afterwards, Officers Morris and Jaques maintained their position to ensure Harrison's compliance with the paramedics' attempt to secure Harrison for transfer to the hospital. Nowhere in the video is there an assault by the three officers with Officer Morris jumping on Harrison with sufficient force to knock the wind out of him or cause blood to exit his mouth. Also, the video does not show any contact by Officer Borgetti with Harrison. Nor does the video show Harrison unconscious after he was placed on the gurney; in fact, once Harrison was in the ambulance, the

---

[2] It is believed that Harrison refers to Officer Morris as the "Lieutenant" and as the "Devil Devil."

14

ambulance can be seen violently rocking back and forth and the paramedics motion for the officers' help. In his response brief, Harrison offers no response in support of these claims, abandoning them. *See Palmer*, 327 F.3d at 597-98. Harrison has offered no evidence to support a claim of excessive force during these events outside of the ambulance.

In the Motion for Summary Judgment, Defendants note that Harrison also alleges that the use of excessive force caused injuries to his mouth when he was restrained in the back of Borgetti's patrol car on April 22, 2014. *See* (ECF 41, ¶¶ 22-24). In his Response to Interrogatory No. 12, Harrison wrote, in relevant part:

> After the hospital an officer came to transport me back to the Griffith Police Department. I was placed in the back of the squad car. When he attempted to buckle my seatbelt he hit me in the mouth with the seatbelt buckle and knocked my tooth out. I was taken to the Griffith Police Department then transported to the Lake County Jail. The Lake County Jail took pictures prior to allowing me to be booked.

(ECF 80-7).

Defendants also note Harrison's deposition testimony:

A: . . . . When the young kid took me from the hospital—
Q: That's what I want to talk about now. Yes, tell me.
A: And he took me back to the same jail that I hung myself, —
Q: yeah.
A: — but he had — before that he threw a buckle to try to get it over me, but I had the air bubble. It couldn't fit, so it hit me in the mouth with him throwing the buckle.
. . .
A: . . . . So he threw it trying to throw it over the—he tried to throw it over the air bubble.
Q: The cast?
A: And the lady told him you can't put him in the car, you have to take him to the hospital through an ambulance, you can't take him to the — do anything. You have to take him and he said, man—she told him something and he tried to throw the buckle and it didn't make it across, so it caught the tooth and it knocked one, two, three of them in. You know how you throw it? It knocked them in and that's where the blood all came from.

15

(ECF 80-8, pp. 61:5-14, 22-24; 62:1-9). Harrison then maintains that he was ultimately transported to the Lake County Jail where pictures were taken. *Id.* at p. 31.

First, the evidence of record is that Officer Borgetti was not the officer who transported Harrison on April 22, 2014. Second, as argued by Defendants, the Lake County Jail booking photograph does not appear to show any injury to Harrison's mouth. Defendants argue that under the objective standard, even if Harrison could present a material fact as to when the alleged mouth injury occurred, any alleged injury to his mouth attributed to the seatbelt was unintentional based on Harrison's own testimony and interrogatory response and, thus, cannot form the basis of an excessive force claim. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015) (recognizing that the "defendant must possess a purposeful, a knowing, or possibly a reckless state of mind" because "'liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process'" (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998))). Harrison offers no response in support of this claim of an injury to his mouth by Officer Borgetti or any other transporting officer in his response brief. Thus, he has abandoned this claim, and there is no genuine issue of material fact that would support a claim of excessive force during the transport.

The Court grants summary judgment in favor of Defendants on Harrison's claims in Count I for excessive force against Defendants Officers Borgetti and Morris as well as in relation to Harrison's transport on April 22, 2014.

### B. Counts III and IV – § 1983 Deprivation of Medical Care

To succeed on his § 1983 claim for deliberate indifference to his medical needs, Harrison must demonstrate that the officers' actions were "objectively unreasonable under the circumstances." *Estate of Perry v. Wenzel*, — F.3d —, —, 2017 WL 4112409, at *8 (7th Cir. Sept. 18, 2017) (quoting *Williams v. Rodriquez*, 509 F.3d 392, 403 (7th Cir. 2007)). The Court considers

four factors when determining whether an officer's response to the medical needs of a person in custody is objectively unreasonable: (1) whether the officer has notice of the detainee's medical need; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) (citing *Williams*, 509 F.3d at 403).

In Count III of the First Amended Complaint, Harrison alleges that the officers deprived him of necessary medical care when they took him to the Griffith Police Department instead of dispatching paramedic assistance to treat his apparent manic depressive episode, which he further alleges proximately caused his suicide attempt. First, the named officers in this lawsuit were not the officers who responded to an earlier March 8, 2014 call to Harrison's residence, which is the incident Harrison references to establish prior knowledge of his medical condition. *See* (ECF 80-9). Harrison has offered no evidence that the named officers in this case were aware of the prior incident or had notice of any medical condition suffered by Harrison. Second, even if knowledge regarding a medical disorder could be imputed to the officers in this case, there is no evidence to suggest that they had notice of any actual medical attention needed by Harrison on April 18, 2014. *See* (ECF 80-1; 80-2). There is no evidence that anyone told the officers that Harrison was suicidal; there is no evidence that anyone requested treatment for Harrison. Defendants move for summary judgment on the claim in Count III on these bases. Harrison offers no response in support of this claim and offers no evidence to support a claim of deliberate indifference to his medical needs on April 18, 2014, abandoning the claim. *See Palmer*, 327 F.3d at 597-98. Because Harrison has not offered any evidence to create a genuine issue of material fact for trial on this claim, the Court grants summary judgment in favor of Defendants on Count III of the First Amended Complaint.

In Count IV, Harrison alleges that, after the transport from St. Catherine's Hospital on April 22, 2014 (Harrison incorrectly alleges the date as April 24, 2014), he was in obvious need of medical care. Harrison further alleges in Count IV that Chief Mance ordered Officer Borgetti to transport Harrison to the Lake County Jail without first providing Harrison with immediate medical attention. In the Motion for Summary Judgment, Defendants argue that Harrison has produced no evidence in support of this claim. Defendants note that there is no evidence to suggest that Chief Mance had knowledge regarding Harrison's alleged mouth injury let alone that the mouth injury could have posed a serious health problem. Defendants argue that, despite testifying that he was taken to the hospital by a friend after being released from the Lake County Jail, Harrison has not produced any medical records demonstrating treatment for a serious medical need on the date in question. Nor is there any evidence that Harrison requested treatment. Again, Harrison offers no response or any evidence in support of this claim in his response brief, abandoning the claim. *See Palmer*, 327 F.3d at 597-98. Because Harrison has identified no facts to support this claim, the Court grants summary judgment in favor of Defendants on Count IV of Harrison's First Amended Complaint.

## C. *Monell* Claims

Defendants move for summary judgment on Counts II and V of the First Amended Complaint, in which Harrison alleges § 1983 failure to train claims against Chief Greg Mance, the Town of Griffith, and the Griffith Police Department based on the allegations of excessive force in Count I and of deprivation of medical care in Counts III and IV. The standard for municipal liability is set forth in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Municipalities cannot be held liable for § 1983 violations under the theory of respondeat superior; rather, a local government may be held liable for a constitutional deprivation only "when [the] execution of a government's policy or custom . . . inflicts the injury" for which the government is

sued under § 1983. *Monell*, 436 U.S. at 694; *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). First, because Harrison's claims of constitutional deprivations (excessive force and deprivation of medial care) do not survive summary judgment, there is no basis for *Monell* liability. Second, Harrison does not offer any argument or evidence supporting his claims of municipal liability in his response brief; rather, he abandons his *Monell* claims. *See Palmer*, 327 F.3d at 597-98. There is no evidence in the record of a municipal policy or practice or of the actions of a policymaker leading to a deprivation of Harrison's constitutional rights. Thus, the Court grants summary judgment in favor of Defendants Mance, the Town of Griffith, and the Griffith Police Department on all claims brought against them in Counts II and V.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the Motion to Strike Non-Sworn Statements Contained in Plaintiff's Response to Defendants' Motion for Summary Judgment [DE 85] and **GRANTS** the Motion for Summary Judgment [DE 79].

The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendants Town of Griffith, Griffith Police Department, Jason Jaques, Tony Morris, Greg Mance, and David Borgetti and against Plaintiff Gary Joe Harrison.

So ORDERED this 19th day of October, 2017.

s/ Paul R. Cherry<br>
MAGISTRATE JUDGE PAUL R. CHERRY<br>
UNITED STATES DISTRICT COURT